One (1) University Plaza, Suite 408            Admitted New York and New Jersey
Hackensack, New Jersey 07601                    maionelawoffices.com
Telephone: (646) 749-8014

# Law Offices of Louis J. Maione
### 303 East 57th Street, 30th Floor
### New York, New York 10022

Telephone: (917) 549-5693
Email:louisjmaione3@gmail.com

Respond to NJ ☐

NY [x]

September 6, 2019

**By Electronic Transmittal**

Hon. Susan D. Wigenton, U.S.D.J.
United States District Court
 for the District of New Jersey
Martin Luther King Building
50 Walnut Street
Newark, New Jersey 07101

       **Re:** *Schiff Food Products Co., Inc. v. Turer Bitkisel Uretim Hayvancilik, Insaat, Su Urunleri, Orman Urunleri Tarim Gida Sanayi ve Ticaret Anonim Sirketi d/b/a Turer Bitkisel A.S. Tepecik Mah., et al.*, Case No. 18-cv-09017 (D.N.J.)

Dear Judge Wigenton:

      I am counsel to the defendant in the above-captioned matter, Turer Bitkisel Uretim A.S. ("Turer Bitkisel").

1

Please accept this letter brief in reply to the Opposition of Schiff Food Products, Inc. ("Schiff") to both the Motion to Dismiss by defendant Celsan Ithalat, and the Cross Motion by Turer Bitkisel to Vacate Default, for which the Court granted approval on August 23, 2019 as a result of the undersigned's request.

### Shaky Opposition

In its opposition to Turer Bitkisel's cross-motion, Plaintiff as much as has admitted that the default must be set aside. The conclusory statements of Schiff's principal aside, Plaintiff's opposition is predicated almost entirely on the absurd claim that Defendants somehow caused "delay" apparently by not agreeing to settle this matter prior to its commencement. Plaintiff has made no showing, however, which can serve to invalidate any of the multiple meritorious defenses demonstrated by Turer Bitkisel nor legitimize Schiff's improper service of process, admittedly effectuated by deceit. In fact, even in opposition to the Cross Motion Plaintiff has failed to proffer a valid Affidavit of Service.

Moreover, stunningly, Plaintiff's remaining arguments are based largely on printouts from a website which belongs to Turer Tarim Ltd., a completely separate entity which has no affiliation or other relationship with Turer Bitkisel, as demonstrated in Turer's initial submissions on this motion. This fundamental misconception further underscores precisely why Turer must be permitted to defend the claims against it.

### Pre-Litigation Negotiations

Most of the arguments proffered by Schiff while recounting the factual background are not only weak but in some instances rather sophomoric. The fact that parties may negotiate for months or even years before a perceived impasse causes one or the other to initiate litigation is hardly tantamount to intentional delay as advanced by Schiff. After all, Schiff could have initiated litigation at any time during the negotiation process had it felt that either of the defendants was being dilatory or disingenuous in its attempts to ameliorate the situation. Yet, when negotiations apparently fell apart in November of 2016, Schiff, in dilatory fashion, took another eighteen (18) months before it filed a Complaint (*see* Schiff Opposition Brief, "Schiff Opp." at page 4) in May of 2018; and Schiff makes no argument or presents any empirical evidence that either of the defendants did anything to frustrate Schiff's efforts to initiate litigation after negotiations fell apart. If anyone was delinquent, it appears to be the Plaintiff.

Moreover, the instant action was commenced approximately one year ago; conversely, Schiff contends that it was supplied with tainted product as early as March of 2014, more than four (4) years before it filed suit. One would expect a Plaintiff, which had to allegedly answer in monetary damages to third-parties as a result of the defendants' actions, to initiate litigation in a timely fashion.[1] Schiff's argument as to delay is simply without merit.

---

[1] In fact, even after it commenced this case, Schiff sat on its own case for so long that this Court scheduled the case for automatic dismissal! Hardly the actions of an aggrieved litigant.

It is clear that the only purpose behind the claim that Turer "changed [its] position [and] denied any and all liability" *after* "initially indicat[ing] an intent to cooperate" is to taint the

default application with introduction of inadmissible settlement discussions. (For example, "Celsan and Turer have finally arrived at the 'negotiating table'…"). Indeed, the only communication from Turer that is offered by Schiff, *see* Ex. B to the Declaration of Arthur S. Garrett, III ("Garrettt" and "Garrett Decl."), is a January 2015 email which contains no admission of liability whatsoever; rather, only an expression of a hope by Turer of continuing the business relationship. In fact, the apparently privileged communication between Schiff and its local counsel in Turkey, inexplicably offered by Schiff in its opposition, *id.,* at Ex. F, confirms that at no point did Turer admit liability or intend to relinquish a defense; and, certainly not for purposes of a lawsuit that would be commenced years later.

**Service of Process on Turer**

**Guerrilla Tactics**

The argument proffered by Schiff to support its position that service of process on Turer was valid also is without merit and rather disingenuous. It is incontrovertible that luring Turer into the jurisdiction for the surreptitious purpose of effecting service of process violates the principles of due process and fair play. In fact, it is telling that in its opposition Schiff does not allege that there was *any* legitimate business purpose for the meeting (only that Turer thought so); to the contrary, Schiff actually admits the subterfuge when it states that *it* "…identified this meeting as an opportunity to serve Turer… ."

Conspicuously missing from the Declaration of Joseph Krausz ("Krausz"), Chief Administrative Officer of Schiff, proffered in support of Schiff's specious argument, is any averment or even indication that anyone had informed Turer beforehand that Schiff had filed its Complaint six (6) weeks earlier, or disclosed the same before commencement of the putative meeting. Instead, Krauzs claims that "Schiff attempted to serve notice of this lawsuit to Turer during the meeting." Krausz Decl. at ¶ 22. And, conspicuously absent is any declaration from Champon & Yung ("Yung"), which putatively "coordinated" the meeting according to Krausz, as to its understanding of the meeting's purpose. The fact that Yung coordinated the meeting actually is of no moment as we have no facts whatsoever concerning what Yung was, or wasn't told by Schiff prior to, or in furtherance of setting up the meeting.[2] Instead, what we have here is rank hearsay!

However, while Schiff's opposition indicates that, "[in] coordinating the meeting, Yung indicated the purpose of the meeting was to arrange new contracts between Schiff and Turer," Krausz in his Declaration proffers absolutely no purpose for the meeting other than to aver that the meeting was coordinated by Yung. Had Schiff disclosed to Yung that it already had filed a Complaint and was ready to serve Yung's client with service of process at the meeting? Had Yung been told the truth at all about the purpose of the meeting?

---

[2] Even if Yung suggested the meeting, as Plaintiff claims, it was clearly viewed by Schiff as no more than an opportunity to sucker Turer into New Jersey.

Finally, we still do not have an Affidavit of Service, an averment under oath, as to valid service upon Turer. The Krausz Decl., apparently the only faux "affidavit of service" offered by Schiff in this litigation with respect to the alleged service (albeit for the first time in opposition to Turer's Cross Motion) states only that "Schiff attempted to serve notice of this lawsuit…" *See, e.g.,* Krausz Decl. at ¶ 22.  Schiff attempted? In addition to not identifying the person who allegedly effectuated such "service", Mr. Krauzs admits that the person allegedly "served" was Mrs. Turer, who was not an authorized agent of Turer, nor a party.[3]

### No Jurisdiction Irrespective of Faulty Service

Improper service aside, Schiff has failed to establish jurisdiction over Turer Bitkisel.

Jurisdiction must exist at the time the acts complained of occur, not created *ex post facto*. And, relying on Yung's doing business in New Jersey is as bogus an argument as one could conjure. Is there a scintilla of evidence that any of the contracts in the instant matter were negotiated through Yung? Plaintiff certainly does not allege that the contracts in the instant matter were negotiated through Yung and, in fact, Turer already has shown that Yung was not the intermediary for those alleged contracts.[4] Is there any evidence of any transactions between Schiff and Turer through Yung other than Schiff's euchering Yung to lure Turer into New Jersey for the set-up meeting? Or, is Schiff arguing that because Yung purportedly set up the bogus meeting that activity somehow imparted jurisdiction on, and over Turer?

### No Proof of Doing Business in NJ

Schiff's opposition also proffers that Turer is a sophisticated business entity doing business in the jurisdiction and, therefore, properly a Defendant here. For that proposition Schiff relies on, "Turer's website statements explaining its sophistication and presence in the American market" and, in particular, Exhibit C appended to the Garrett Declaration to substantiate that presence. However, the printouts comprising Exhibit C **are not** from a website owned and/or operated by Turer Bitkisel; rather, the website is owned and operated by Turer Tarim Ltd., a

---

[3] Schiff's reliance on cases where defendants attempted to evade service in the comfort of their own homes is misplaced and inapposite. *E.g. World Entm't Inc. v. Brown,* 487 Fed. Appx. 758 (3d Cir. 2012) (defendant actively evaded service by shutting the door of her own house after recognizing the process server and refusing to answer after the server knocked); *Gambone v. Lite-Rock Drywall Corp.,* 124 Fed. Appx. 78 (3d Cir. 2005), *affirming Gambone v. Lite-Rock Drywall Corp.,* 2003 U.S. Dist. LEXIS 13916, ** 10-11, Civ. Action No. 01-1071 (E.D. Pa. Aug. 7, 2003) (after denying he was the defendant, defendant slammed the door of his own house in the process server's face)("At least in cases where the defendant has attempted to evade service, service was found sufficient, despite a failure to manually delivery the process where the marshal left the papers on the seat of the defendant's vehicle, pitched the papers through a hole in the screen door of the hiding defendant's apartment, or threw the documents over the defendant's fence after determining that the defendant resided at that address, photographed the papers on the defendant's lawn, and sent a copy of the papers to the defendant's address by first-class mail.")  Here, by Plaintiff's own admission, Plaintiff induced Turer to cross an ocean, enter the jurisdiction, and Plaintiff's office, only to be handed papers by a random person who also happened to be there to someone not authorized to accept service. This scenario is by no means analogous to the fact patterns in cases cited by Plaintiff.

[4] As discussed above, Schiff itself alleges that Yung set up the meeting "to arrange *new contracts* between Schiff and Turer".

subsidiary of the other defendant, Celsan. [5] Plaintiff's so-called proof of jurisdiction, proves only one thing, to wit: Turer must be permitted to defend the claims against it to avoid great prejudice. It likely proves another; Schiff has been confused about more things than not.

Even so, the averment by Mr. Garrett, under oath, falls far short of what Schiff seems to be trying to persuade the Court because this particular website does not establish jurisdiction over either of the defendants despite Mr. Garrett's averment that, "to the best of [his] knowledge" it "…represents Turer's longstanding public-facing [sic] position on its business ….." Garrett Decl. ¶2, page 2. Nor does it remotely establish the monumental leap of logic that a foreign entity somehow attains the sophistication necessary to understand and appreciate the American system of jurisprudence.

Neither Mr. Garrett, nor his client, can ascribe to Turer Bitkisel the underlying activities necessary to establish jurisdiction over Turer Bitkisel by relying on the website of Turer Tarim, upon information and belief, an affiliate of its co-defendant, Celsan. The defendants are separate and independent parties in this matter. And, it is respectfully suggested that those colleagues of Mr. Garrett at Kellerman and Heckman, LLP, who turned up this website, should have exercised the diligence to make sure that they had the correct entity (party) before Mr. Garrett could make such a statement, under oath, "to the best of his knowledge." Simply put, Mr. Garrett has no knowledge about who owns this website and there is no jurisdiction over Turer in New Jersey. Consequently, this Court should grant Turer's Cross Motion and order the parties to arbitration.

The basis of Schiff's statement that "Turer admits that the United States is its primary market and sells spices … with the understanding that products will end up in New Jersey", Schiff Opp. at p. 2, is unclear and without foundation. [6]

**No Prejudice to Schiff**

**Speculative Money Damages Do Not Support Prejudice**

Throughout its opposition Schiff complains that it is being prejudiced, *inter alia*, by being "…deprived of the money owed it by the Defendants as a result the tainted cumin recall… ." ( Schiff Opp., p.7). Unless the undersigned is mistaken, Schiff's entitlement to any money damages, whether it could have used them for capital improvements or expansion, is a bit premature but depends on proving its case at trial or arbitration and establishing that entitlement in a case where it is apparent that the product was re-packaged several times before it

---

[5] See ECF Doc. No. 29-8 (the Declaration of Haldun Cica, the "Cica Decl.,") at pars. 4-7, n. 1-2 and Exs. A and B; see also ECF Doc. No. 29-8 ("Turer Brief") at p. 19, section I(A)(iv).

[6] Finally, on the issue of *forum non conveniens*, other than the fact that Plaintiff's office is located in New Jersey (and that Sayia also maintains an office here), Plaintiff has pointed to no link between this State and its claims. In fact, Schiff appears to claim that the bulk of necessary discovery in this action must occur in Turkey "including about Defendants' quality assurance processes and the cumin lots at issue". Schiff Opp., p. 8.

ever got to the consumer. Protracted litigation and/or speculative damages, and allegedly lost profits, are not the basis of unproven "prejudice" necessary to defeat the Cross Motion. [7]

Thank you in advance for your time and consideration.

Respectfully yours,
*Louis J. Maione*

Louis J. Maione

cc: P. Gunay, Esq.
    E. Gulistan, Esq.

---

[7] While Plaintiff claims that the Third Circuit has held that delay alone may be a sufficient basis for establishing prejudice, the very case Plaintiff cites for its reliance, *Emcasco Ins. Co. v. Sambrick,* 834 F.2d 71 (3d Cir. 1987), emphasizes that "delay in realizing a satisfaction on a claim *rarely* serves to establish the degree of prejudice (footnote 7 cont'd) sufficient to prevent the opening of a default judgment entered at an early stage of the proceeding" and held that the trial Court's refusal to set aside the entry of default judgment constituted an abuse of discretion. Plaintiff has offered no evidence that this is the extremely rare case where the few month delay has been so prejudicial that it evidences "flagrant bad faith" on the part of either defendant. 834 F.2d at 75.